UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JEFFREY SOLEIMANI & JAN SOLEIMANI,      :
                                        :
                        Petitioners,    :
                                        :
        -against-                       :
                                        :
BERGI ANDONIAN & RENAISSANCE            :
CARPET & TAPESTRIES, INC.,              :
                                        :
                        Respondents.    :
                                        :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/10/2022

1:21-cv-1018-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

     For years, petitioners Jan and Jeffrey Soleimani and respondent Bergi Andonian owned and operated respondent Renaissance Carpets & Tapestries, Inc. ("RCT").  When business soured, however, so did the relationship between the Soleimanis and Andonian.  Ultimately, the Soleimanis petitioned a New York state court to dissolve RCT and distribute its assets.  After completing discovery, the Soleimanis and Andonian agreed in late 2019 to appoint an arbitrator to divide RCT's assets and resolve other claims related to their business relationship.  The arbitrator issued a final award resolving the parties' disputes in January 2021, largely finding in favor of the Soleimanis.  The Soleimanis subsequently petitioned the Court to confirm the award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention").

     Andonian has objected to confirmation of three sections of the arbitral award, and has moved to vacate those sections under § 10(a)(4) of the Federal Arbitration Act (the "FAA").  He argues that the arbitrator exceeded his authority by awarding RCT the net amount of the proceeds from the sale of a factory owned by its nonparty subsidiary, directing Andonian to organize an

auction of the remaining assets of the same nonparty subsidiary, and shifting the costs of the arbitration to Andonian for dilatory conduct.  For the reasons discussed below, Andonian's objections to confirmation and arguments for vacatur fail.  The Court nonetheless exercises its authority under § 11 of the FAA to modify the text of section VIII.H.1 of the award to clarify that it does not require Andonian to engage in unlawful conduct.  Accordingly, Andonian's motion to vacate the award is DENIED.  The Soleimanis' motion to confirm the award is GRANTED except to the extent that section VIII.H.1 of the award is MODIFIED, as discussed below.

## I.   BACKGROUND

### A.   Facts

#### 1.   Parties

Respondent RCT is a New York corporation specializing in the manufacture and sale of fine carpets.  Final Award (the "Award"), Dkt. No. 25-8, at 1; Pet. to Confirm Arbitral Award ("Pet. to Confirm"), Dkt. No. 24, at 6; Mot. to Vacate Arbitral Award ("Mot. to Vacate"), Dkt. No. 29, at 3.  RCT has three shareholders:  petitioner Jan Soleimani (45% of shares), petitioner Jeffrey Soleimani (10% of shares), and respondent Bergi Andonian (45% of shares).[1]  Award at 1; Pet. to Confirm at 6; Mot. to Vacate at 3.

RCT owns a 91% stake in nonparty Yantai China Renaissance Fine Arts Co., Ltd. ("China Renaissance"), a company organized in the People's Republic of China.  Award at 6; Mot. to Vacate at 3; *see also* Amendments of the Articles of Association of Yantai China Renaissance Fine Arts Co., Ltd. ("China Renaissance Arts."), Dkt. No. 28-18, at 2–3.  The remaining 9% of the shares of China Renaissance are owned by nonparty Philippe Hecquet.  Award at 6; China Renaissance Arts. at 2.

---

[1] Because Jeffrey Soleimani has only nonvoting shares, Jan Soleimani and Andonian each exercise 50% of the voting control over RCT.  Award at 1.

### 2. Business Relationship and Early Litigation

Andonian and the Soleimanis were partners in the carpet trade for decades.  Award at 5–6.
From the beginning, Jan Soleimani's main contribution to their business, RCT, was capital, while
Andonian took care of RCT's day-to-day operations.  *Id.*  Jeffrey Soleimani initially worked for RCT
as a stock clerk but later took on a more significant role, for which he was ultimately compensated
with 10% of the shares in RCT.  *Id.* at 6–7.

By 2009, however, RCT's business had dried up.  *Id.* at 7.  In 2012, the Soleimanis'
relationship with Andonian had soured to the point that the Soleimanis filed a petition in New York
state court to have RCT judicially dissolved and its assets divided among the parties.  Pet. to
Confirm at 7.  Andonian responded in November 2012 by seeking to compel arbitration pursuant to
the parties' shareholder agreement, *id.*, which contained the following arbitration clause:

> In the event that there shall be an impasse with respect to any action of [RCT] or its
> shareholders, directors or officers, the parties agree to resolve the matter in
> controversy by arbitration in accordance with the laws of the State of New York by
> three arbitrators, one of whom shall be selected by JAN SOLEIMANI, one of whom
> shall be selected by BERGI ANDONIAN, and one of whom shall be selected by the
> other two arbitrators.

RCT Shareholder Agreement, Dkt. No. 25-2, ¶ 7.  The parties subsequently agreed to stay the New
York state court proceeding and to arbitrate their dispute before the American Arbitration
Association (the "AAA").  Pet. to Confirm at 7.

By 2016, the arbitration proceeding had stalled.  The Soleimanis therefore petitioned the
New York state court to lift the stay so that the parties could conduct discovery.  *Id.*  The court
lifted the stay, and by April 2019, the parties had completed discovery and were moving towards
trial.  *See id.* at 8.

### 3.      Second Arbitration

Before trial, on October 15, 2019, Andonian and the Soleimanis agreed to return to arbitration before a panel of three arbitrators.  Pet. to Confirm at 8; Mot. to Vacate at 4; *see also* State Court Stip., Dkt No. 25-4, at 1.  The parties agreed to subject themselves to the AAA Commercial Rules and "to put forth their best efforts to complete the binding arbitration by the end of the 2019 calendar year."  State Court Stip. at 2.  The parties agreed that the arbitration would "resolve the division of all assets of [RCT] without the appointment of a receiver."  *Id.*

Approximately two weeks later, on October 30, 2019, Andonian and RCT filed a demand for arbitration with the AAA, invoking both the arbitration agreement contained in the parties' shareholder agreement and the arbitration agreement contained in the parties' state court stipulation.  Award at 2; Mot. to Vacate at 4.  The parties subsequently agreed that the arbitration would proceed before only one arbitrator.  Award at 2.

### 4.      Yantai Factory

During the course of the parties' dispute in New York state court, they cooperated to facilitate the sale of some of RCT's assets.  RCT owned, through China Renaissance, two floors of a textile factory in Yantai, China.[2]  In August 2018, Jan Soleimani, as legal representative of China Renaissance, executed a power of attorney granting Andonian "any and all . . . powers of the legal representative of [China Renaissance]" for sixty days to facilitate the sale of the factory floors.  *See* Factory Sale Records, Dkt. No. 28-16, at 2–4.  Andonian used this power of attorney to sell the

---

[2] The record shows that the factory floors in Yantai were owned by China Renaissance rather than RCT directly.  When Jan Soleimani executed a power of attorney to enable Andonian to arrange the sale of the Yantai factory, he did so as the legal representative of China Renaissance.  *See* Yantai Factory Sale Records, Dkt. No. 28-16, at 2.  Likewise, the documents formalizing the factory sale all indicate that the factory was being conveyed by China Renaissance and that the proceeds would be paid to China Renaissance.  *See id.* at 14, 18–20.  The identity of the factory's owner was considerably muddled, however, by the parties' statement of undisputed material facts, in which the parties agreed that RCT and Hecquet somehow owned shares in the factory itself.  *See* Dkt. No. 28-24, ¶ 8 ("RCT originally purchased 51% of the shares of the Yantai factory from a Chinese Partner.").  As discussed below, this distinction does not ultimately affect the enforceability of the arbitral award, even if it may affect the procedure Andonian will have to follow to comply with it.

factory floors to another company for approximately 7.9 million renminbi. *See id.* at 11–12; Joint Statement of Undisputed Facts, Dkt. No. 28-24, ¶ 22; Award at 31.

The Soleimanis complained at arbitration that Andonian had withheld the proceeds of the factory sale from RCT. The parties, along with Hecquet, had previously agreed that the net proceeds of the sale would be distributed among the parties, with 91% going to RCT (to be further distributed to its owners individually) and 9% to Hecquet. *See* Statement of Undisputed Facts ¶¶ 9, 22; Award at 31. As of the 2020 arbitration, however, Andonian remained in control of the bulk of the proceeds. Award at 32.

### 5.    Arbitral Award

On January 7, 2021, the arbitrator issued a final award. Relevant here, the arbitrator awarded RCT $807,687, to be paid by Andonian personally "on account of the proceeds of the sale of Renaissance China."[3] Award at 36. The arbitrator further ordered that, unless the parties agreed to another procedure, Andonian shall "arrange an auction in China . . . for any remaining property located [in China]," to "be paid to RCT for division among the shareholders." *Id.* Finally, the arbitrator awarded the Soleimanis $32,350 in fees and expenses to the AAA and $58,440 in compensation and expenses to the arbitrator. *Id.* at 37–38.

### B.    Procedural History

On January 22, 2021, the Soleimanis filed a petition in New York state court to confirm the arbitral award under New York law and the FAA. *See* Verified Pet. to Confirm Arbitral Award, Dkt.

---

[3] The arbitrator found that "[i]t is not contested that Renaissance China was sold and that the sale price was 7,900,000 in yuan or RMB . . . . Jan Soleimani, who was the nominal head of Renaissance Yantai, cooperated and provided Andonian with a power of attorney to facilitate the sale . . . ." Award at 31. The parties agree that it was the factory rather than the Chinese subsidiary that was sold for 7.9 million renminbi. *See* Pet. to Confirm at 13; Mot. to Vacate at 6; Statement of Undisputed Facts, Dkt. No. 25-9, ¶ 22 ("[T]he Yantai factory was sold so that the proceeds could be split in accordance with the Shareholder Agreement. The total sale is 7,900,000 RMB.").

No. 1-1, at 2.  On February 4, 2021, Andonian removed the case to the United States District Court for the Southern District of New York.  *See* Notice of Removal, Dkt. No. 1-7.

On April 26, 2021, the Soleimanis filed a petition to confirm the arbitral award under the New York Convention.  Pet. to Confirm at 1.  On May 24, 2021, Andonian filed a brief in opposition.  Dkt. No. 31.  On June 7, 2021, the Soleimanis filed a brief in reply.  Dkt. No. 34.

Meanwhile, on April 27, 2021, Andonian filed a motion to vacate three sections of the arbitral award under the FAA.  Mot. to Vacate at 1.  On May 25, 2021, the Soleimanis filed a brief in opposition.  Dkt. No. 33.  On June 8, 2021, Andonian filed a brief in reply.  Dkt. No. 39.

## II.   LEGAL STANDARD

"[T]o avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation, arbitral awards are subject to very limited review."  *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 588 (2d Cir. 2016) (internal quotation marks omitted) (alteration in original) (quoting *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993)).  "Under the [New York Convention], which governs this dispute, a court must confirm an arbitral award 'unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'"  *Id.* (quoting 9 U.S.C. § 207).  In addition, "[t]he award in this case having been rendered in the United States, available grounds for vacatur include all the express grounds for vacating an award under the FAA."  *Id.*; *see also Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007).

Section 10(a) of the FAA "sets forth specific grounds for vacating" an arbitration award. *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121 (2d Cir. 2011).  Under § 10(a), an award may be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to

the controversy; or of any other misbehavior by which the rights of any party have
been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that
a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). In addition to the grounds for vacatur specified in § 10(a), courts in the Second

Circuit recognize an additional, "judicially-created ground, namely that 'an arbitral decision may be

vacated when an arbitrator has exhibited a manifest disregard of law.'" *Sterling Jewelers*, 646 F.3d at

121 (quoting *Westerbeke Corp. v. Daihatsu Motor Co. Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002)).

A party seeking to vacate an arbitration award under the manifest disregard standard must

show "something beyond and different from a mere error in the law or failure on the part of the

arbitrators to understand or apply the law." *Westerbeke*, 304 F.3d at 208 (quoting *Saxis S.S. Co. v.

Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967)). "An arbitral award may be vacated for

manifest disregard of the law 'only if a reviewing court . . . find[s] both that (1) the arbitrators knew

of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored

by the arbitrators was well defined, explicit, and clearly applicable to the case.'" *Wallace v. Buttar*, 378

F. 3d 182, 189 (2d Cir. 2004) (alterations in original) (internal quotation marks omitted) (quoting

*Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 263 (2d Cir. 2003)). In

considering whether an arbitral award exhibits manifest disregard of the law, "[a] federal court may

not conduct a reassessment of the evidentiary record." *Id.* at 193. Accordingly, an arbitral award

"should be enforced, despite a court's disagreement with it on the merits, if there is a *barely colorable

justification* for the outcome reached." *Id.* at 190 (quoting *Banco de Seguros del Estado*, 344 F.3d at 260).

### III.    DISCUSSION

#### A.    Section VIII.F of the Award

##### 1.    Enforcement against nonparties

Andonian argues that the Court should vacate section VIII.F of the Award because, in requiring Andonian to pay RCT $807,687, the arbitrator exceeded his powers by determining the "contractual rights of Hecquet [and] China Renaissance," who were not formal parties to the arbitral proceeding.  Mot. to Vacate at 17.  The text of the Award, however, shows that the arbitrator did no such thing.  Section VIII.F of the Award states that "RCT shall recover *against Andonian*, on account of the proceeds of the sale of Renaissance China, $807,687.00, without interest."  Award at 36 (emphasis added).  Section VIII.F of the Award determines the right of RCT to receive a sum of money and the obligation of Andonian to pay that sum of money.  It does not decide the legal rights of Hecquet, China Renaissance, or any other nonparties.

Andonian suggests that the Award would require Andonian to "deliver the Yantai Factory sale proceeds to RCT" by taking those funds from China Renaissance's bank accounts in China.  *See* Reply Br. in Supp. of Mot. to Vacate, Dkt. No. 36, at 4–5 (noting that Andonian does not have control over China Renaissance's bank accounts).  The Award does not require him to do so.  It merely requires him to come up with the sum due to RCT.  As the arbitrator explained, the record was unclear as to the location and net amount of the proceeds.  *See* Award at 31 ("Andonian was vague as to the location of the remaining proceeds [of the factory sale] . . . ."); *id.* at 32 ("The record is less clear as to the expenses that should properly be subtracted from the proceeds of sale.").  Finding that Andonian "directed all aspects of the sale," "has knowledge and control over the proceeds," and in fact had already used up to $150,000 of the proceeds to pay his own legal fees, the arbitrator held Andonian personally responsible for paying RCT an amount equal to its share of the

sale proceeds.  *Id.* at 32, n.15.  That fell squarely within the arbitrator's authority to determine the legal rights of Andonian and RCT, both parties to the arbitration.

### 2.     Manifest disregard of the law

Andonian similarly argues that the arbitrator manifestly disregarded the laws of the People's Republic of China when he awarded RCT $807,687.  *See* Reply Br. in Supp. of Mot. to Vacate, Dkt. No. 36, at 7 ("The Arbitrator ignored . . . basic legal principles by directing Andonian—who is not a China Renaissance shareholder—to distribute [its] assets without regard for its liabilities."); Mot. to Vacate at 21 ("[T]he Award should not stand insofar as it directs Andonian to disregard the corporate structure of [China Renaissance] to the detriment of its minority shareholder and potentially in violation of Chinese criminal law.").  That argument, like Andonian's argument that the Award exceeded the arbitrator's powers, misreads the text of the Award.  Section VIII.F of the Award requires Andonian personally to pay RCT $807,687.  Award at 36 ("RCT shall recover *against Andonian*, on account of the proceeds of the sale of Renaissance China, $807,687.00, without interest." (emphasis added)).  It does not direct China Renaissance to distribute any assets, much less to do so without regard for its legal liabilities.  It therefore does not ignore China Renaissance's legal liabilities, and thus does not manifestly disregard the laws that determine those liabilities.

### B.     Section VIII.H.1 of the Award

### 1.     Enforcement against nonparties

Andonian argues that section VIII.H.1 of the Award should be vacated because "the Arbitrator had no authority over assets of a Chinese company who was not a party to the Arbitration."  Reply Br. in Supp. of Mot. to Vacate, Dkt. No. 36, at 1.  That argument fails because section VIII.H.1 of the Award binds only Andonian.  Regardless of whether the arbitrator had authority over China Renaissance, a nonparty to the arbitration, he clearly had authority over Andonian, the party who commenced the arbitration.  Since section VIII.H.1 of the Award does not

purport to bind anyone other than Andonian, and since the Soleimanis are only seeking to enforce section VIII.H.1 of the Award against Andonian, the Court need not determine whether the arbitrator had authority over China Renaissance.

Andonian cites to several cases in which courts have refused to enforce arbitral awards against nonparties. *See* Mot. to Vacate at 15–16. Those cases are inapposite. The petitioners in those cases sought to confirm arbitral awards that purported to bind nonparties to the arbitration. *See, e.g.*, *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp. of Panama, S.A.*, 312 F.2d 299, 300–01 (2d Cir. 1963) (affirming an order vacating an award requiring nonparty guarantor to pay contract damages); *Porzig v. Dresdner, Kleinwort, Benson, North America LLC*, 497 F.3d 133, 140–41 (2d Cir. 2007) (vacating an award requiring nonparty attorney to return contingency fee to party). In this case, by contrast, the Soleimanis seek only to bind Andonian, not China Renaissance or Hecquet. Section VIII.H.1 of the Award, by its express terms, is binding on neither China Renaissance nor Hecquet.

Andonian similarly cites to a handful of cases in which courts in this district have refused to enforce arbitral awards that, while not expressly binding on nonparties, "unnecessarily determine[] the rights of non-parties." Mot. to Vacate 15–16. Those cases are equally inapplicable. The petitioners in those cases sought to confirm awards that benefitted nonparties without resolving the parties' dispute. *See, e.g.*, *Techcapital Corp. v. Amoco Corp.*, 99 CIV. 5093, 2001 WL 267010, at *16 (S.D.N.Y. Mar. 19, 2001) (vacating an award forbidding party from seeking indemnification under prior agreement with nonparty). In *Techcapital*, the court found that forbidding one party from seeking indemnification from a nonparty was not "necessary to resolve the conflict between" the parties or "intertwined with any other part of the Award" and therefore was impermissibly punitive. *See id.* at *16–17. Here, to the extent section VIII.H.1 of the Award requires Andonian to act to the benefit of nonparties—e.g., Hecquet, who will share in 9% of the net proceeds of the auction of

China Renaissance's assets—that benefit is purely incidental to the primary purpose of the award, which is to divide the parties' assets.

### 2.    Manifest disregard of the law

Andonian argues that section VIII.H.1 of the Award should be vacated for manifest disregard of the law because it requires him to violate the laws of the People's Republic of China. Mot. to Vacate at 22 ("[T]he Award should not stand insofar as it directs Andonian to disregard the corporate structure of [China Renaissance] to the detriment of its minority shareholder and potentially in violation of Chinese criminal law."). Section VIII.H.1 of the Award may reasonably be read in a way that does not require Andonian to break any laws. However, Andonian has advanced a reading of section VIII.H.1 of the Award that would require him to disregard Chinese corporate law and subject himself to criminal liability. *See id.*; Reply Br. in Supp. of Mot. to Vacate at 8. The Court therefore, as set out below, modifies section VIII.H.1 of the Award to assure Andonian that he will not be required to affect his reading of the award.

The arbitrator charged Andonian with auctioning off China Renaissance's remaining assets in order to accurately and conveniently resolve the parties' dispute over the value those assets—not to require Andonian to misappropriate property or otherwise violate Chinese law. *See* Award at 28. As the arbitrator explained, "the most practical way to deal with [China Renaissance's remaining] property is to direct its auction sale." *Id.* Since "Andonian has had the most experience with RCT's operations in China and . . . may have an interest in" the current location of the property, the arbitrator made him responsible for organizing the sale. *Id.*

The obvious inspiration for the arrangement provided for by the arbitrator in section VIII.H.1 of the Award was the sale of China Renaissance's factory, which was similarly organized by Andonian. To sell the factory, Andonian obtained a power of attorney from Jan Soleimani, which permitted Andonian to represent China Renaissance. He also obtained written approval to sell the

factory from Jan Soleimani and Philippe Hecquet.  After the sale, Andonian used a portion of the gross proceeds to pay costs related to the transaction and to pay severance to China Renaissance's former factory workers, as required by Chinese law.

In that context, the most plausible reading of "arrange an auction" in section VIII.H.1 of the Award is "*take all legally and practically necessary steps to* arrange an auction."[4]  Likewise, the most plausible reading of the phrase "[t]he proceeds shall be paid to RCT" is "[t]he proceeds *net of any payments due to other parties* shall be paid to RCT," just as the amount to paid to RCT on account of the sale of the Yantai factory was net of the costs of sale, severance, taxes, and Hecquet's share. Since the most plausible reading of section VIII.H.1 of the Award makes allowances for the legal liabilities that Andonian claims the arbitrator manifestly disregarded, it could be confirmed as written.

Still, for the sake of removing all doubt as to what the award requires of Andonian, the Court will modify its wording for clarity.  Under § 11 of the FAA, a federal court "may make an order modifying or correcting" an arbitral award "[w]here the award is imperfect in matter of form not affecting the merits of the controversy."  9 U.S.C. § 11(c).  "Courts have interpreted that provision narrowly to allow 'courts to modify arbitration awards to reflect the clear intent of the arbitrator when that intent was not expressed due to error or oversight.'"  *Berkowitz v. Gould Paper Corp.*, 21-CV-6582, 2022 WL 118232, at *4 (S.D.N.Y. Jan. 12, 2022) (quoting *Vertical UK LLP v. Dundee Ltd.*, 10 Civ. 1173, 2011 WL 2419859, at *4 (S.D.N.Y. June 13, 2011)); *see also* 9 U.S.C. § 11 ("The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.").  Where the arbitrator's intent is apparent, modifying the award to express that intent is preferable to vacating the award and remanding it to the arbitrator.  *Estate of Scherban v.*

---

[4] As Andonian's own counsel suggests, those steps might include the same steps he took to arrange for the sale of the Yantai factory: obtaining a power of attorney from Soleimani and working with Hecquet to coordinate the sale.  *See* Reply Br. in Supp. of Mot. to Vacate at 8.

*Lynch*, 14-CV-6312, 2021 WL 2581278, at *12 (S.D.N.Y. June 23, 2021) ("Remand should not be granted where the court can resolve any alleged ambiguities in the award by modification . . . ." (citation and internal quotation marks omitted)); *see also* Restatement (Third) of the U.S. Law of International Commercial Arbitration § 4.34 cmt. b (Am. L. Inst., Proposed Final Draft Apr. 24, 2019) ("A court does not remand if it may by consulting the arbitral record ascertain with certainty the tribunal's intent."). Here, as discussed above, the arbitrator's intent in directing Andonian to organize the auction was clear from both the Award and the arbitral record.

Because modifying the award falls between the relief requested by Andonian (vacatur) and the Soleimanis (confirmation as written), modifying the Award is "consistent with the relief actually requested" by the parties. *See* Restatement (Third) of the U.S. Law of International Commercial Arbitration § 4.33 reporters' note e; *see also id.* cmt. e ("In the context of a proceeding to vacate or confirm a U.S. Convention award, a court may elect sua sponte to correct or modify an award."). Indeed, Andonian suggested a potentially more acceptable version of section VIII.H.1 of the Award in briefing on his motion to vacate the section. *See* Reply Br. in Supp. of Mot. to Vacate, Dkt. No. 36, at 8 ("Perhaps [the arbitrator] could have ordered RCT to work with Hecquet to coordinate an auction of all assets . . . [and] directed Jan Soleimani to execute another Power of Attorney toward these ends.").

To allay Andonian's concerns that section VIII.H.1 of the Award requires him to sell assets of a company that he only indirectly owns and to take all the proceeds for himself and the Soleimanis, the Court will MODIFY the text of section VIII.H.1 of the Award as follows:

> Andonian shall **take all legally and practically necessary steps to** arrange an auction in China within 90 days of the date of **the confirmation of** this award for any remaining property located there, as further specified in section V.E.1, unless the parties agree otherwise. The proceeds**, net of any payments due to other parties,** shall be paid to RCT for division among the shareholders.

The Court's modifications (in bold) make clear that Andonian is to coordinate the auction of China Renaissance's remaining assets with the Soleimanis and Hecquet, just as he coordinated the sale China Renaissance's factory floors in 2019. It also makes clear that he is to arrange for the proceeds of the auction to be distributed to China Renaissance's shareholders in accordance with all applicable laws. The Court's modifications preserve the substance of the award and all merits determinations that underly it. The sole effect of the modifications is "to effect the intent" of the award "and promote justice between the parties." *See* 9 U.S.C. § 11.

### C.  Section VIII.J.3 of the Award

Finally, Andonian argues that the Court should vacate section VIII.J.3 of the Award under § 10(a)(4) of the FAA because the arbitrator exceeded the scope of his authority when he shifted the costs of the arbitration to Andonian. Reply Br. in Supp. of Mot. to Vacate, Dkt. No. 36, at 9. The Second Circuit has "consistently accorded the narrowest of readings to the FAA's authorization to vacate awards pursuant to § 10(a)(4)." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 342 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Banco de Seguros del Estado*, 344 F.3d at 262).[5] The Court's inquiry "focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Banco de Seguros del Estado*, 344 F.3d at 262 (quoting *Westerbeke*, 304 F.3d at 220).

To be sure, arbitrators are not permitted to ignore parties' contracts and "dispense [their] own brand of industrial justice." *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671

---

[5] Andonian also argues that the Award should be vacated under Article V(1)(c) of the New York Convention, which he acknowledges is interpreted under the same standard as § 10(a)(4) of the FAA. Article V(1)(c) of the New York Convention permits a court to refuse to enforce an arbitration award that "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or . . . contains decisions on matters beyond the scope of the submission to arbitration." "This provision tracks in more detailed form" § 10(a)(4) of the FAA and should similarly "be construed narrowly." *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 976 (2d Cir. 1974); *see also Phoenix Bulk Carriers, Ltd. v. Am. Metals Trading, LLP*, No. 10-cv-2963, 2013 WL 5863608, at *7 (S.D.N.Y. Oct. 31, 2013).

(2010).  But "'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' a court's conviction that the arbitrator has 'committed serious error' in resolving the disputed issue 'does not suffice to overturn his decision.'"  *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009) (quoting *United Paperworkers Int'l Union AFL–CIO v. Misco., Inc.*, 484 U.S. 29, 38 (1987)); *see also Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 573 (2013) ("So long as the arbitrator was 'arguably construing' the contract . . . a court may not correct his mistakes under § 10(a)(4)." (citation omitted)).

Here, the parties empowered the arbitrator to award costs when they adopted the AAA Commercial Rules.  *See* Dkt. No. 25-4 at 2 ("The parties agree to follow AAA commercial rules . . . .").  AAA Commercial Rule R-47(c) grants the arbitrator authority to assess administrative fees, expenses, and the arbitrator's compensation and to "apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate."

Andonian acknowledges this authority, but argues that the arbitrator was required to defer to the parties' agreement that "[RCT] shall pay for all AAA expenses relating to this arbitration."  Dkt. No. 25-4 at 2.  In support, Andonian cites to AAA Commercial Rule R-47(a), which provides that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties."  However, the parties' agreement makes no mention of the arbitrator's authority, and cannot be read as revoking the arbitrator's ability to allocate fees pursuant to AAA Commercial Rule R-47.  *Cf.* Restatement (Third) of the U.S. Law of International Commercial Arbitration § 4.12 cmt. c (adopting a presumption that a provision limiting the availability of a remedy "is a contractual limitation on remedies *but not a specific restriction on the tribunal's authority*" (emphasis added)).

Instead, Andonian's argument amounts to a challenge of the arbitrator's interpretation of the parties' agreement regarding expenses.  In his ruling on respondents' request for modification of the Award, the arbitrator expressly rejected this argument:

> [Andonian argues] that the Award should not have provided for Andonian to bear the fees, expenses and compensation related to the award, despite the fact that AAA Rule 47 provides therefor, because the parties stipulated that RCT would pay the costs of the arbitration.  However, the parties also agreed that the AAA commercial rules would govern, making Rule 47 the governing law of this Arbitration.  RCT paid the costs of this Arbitration, as the parties agreed, but these costs were properly allocated to Andonian in accordance with Rule 47.

Dkt. No. 25-11, at 2.  Thus, the arbitrator interpreted the parties' agreement to mean that RCT would initially and by default pay the costs of the arbitration but that the costs could nonetheless be "allocated" to Andonian under AAA Commercial Rule R-47.  Because the arbitrator had authority to allocate costs under the AAA Rules and was "arguably construing" the parties' contract when he awarded costs, the Award is shielded from vacatur under § 10(a)(4) of the FAA.  *See Oxford Health Plans*, 569 U.S. at 573.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the Soleimani's motion to confirm the arbitral award under the New York Convention, except with respect to section VIII.H.1 of the award, which the Court MODIFIES under § 11 of the FAA as described above.  Andonian's motion to vacate the award under § 10 of the FAA is DENIED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 24 and 27.

SO ORDERED.

Dated:  March 10, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge

16